[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10804

Non-Argument Calendar

_____

VALERIE OLABISI,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:21-cv-00020-JBT

_____

Before GRANT, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Valerie Olabisi appeals the district court's affirmance of the Social Security Administration's ("SSA") denial of her claim for disability insurance benefits ("DIB"), under 42 U.S.C. § 405(g), and supplemental security income ("SSI"), under 42 U.S.C. § 1382c(a)(3)(A). Olabisi argues that the administrative law judge's decision was not substantially based on the medical records and that the judge ignored the intensity, persistence, and limiting effects of her physical symptoms. Additionally, in a section of her brief entitled "Closing Concerns," she disagrees with the administrative law judge's treatment of the medical opinion of Dr. Luther Puadesty,[1] description of her appearance and demeanor while testifying, and reliance on the hypothetical of the vocational expert ("VE") in assessing her residual functioning capacity ("RFC"). For the following reasons, we affirm.

## I.     BACKGROUND

_____

[1] The record reflects some confusion about whether the doctor's name was "Luther D. Quarles" or "Luther D. Puadesty." We need not resolve this issue because, as discussed below, Olabisi abandoned any challenge to the administrative law judge's consideration of that medical opinion. For purposes of this opinion, however, we refer to the doctor as Dr. Puadesty.

### A. Administrative Proceedings

On May 23, 2018, Olabisi applied for DIB and SSI, stating she became unable to work based on her disabling condition that began on February 12, 2018. The SSA denied Olabisi's application; Olabisi requested reconsideration, but the SSA again denied the application. Olabisi then requested a hearing before an administrative law judge.

In her disability report, Olabisi indicated that vertigo, high blood pressure, migraines, blackouts, knee pain, back pain, glaucoma, chest valves, and a "messed up" "disc going down [her] spine" limited her ability to work. Olabisi's highest level of education was twelfth grade, and she previously worked as a bus driver. Olabisi noted that she was prescribed her medications for her high blood pressure, her migraines, her depression, and her muscle spasm in her back.

In her function report, Olabisi stated the following. She lived alone, and her conditions limited her ability to work because she became light-headed and dizzy and experienced changes in eyesight, especially when she had a migraine. Additionally, the pain made it hard for her to stand and sit for periods of time. Olabisi cared for her six-year-old daughter alone, and her daily activities included waking her daughter up and getting her dressed for school, going to appointments that she had that day or sitting in pain, attempting to clean up if she could stand without getting dizzy, waiting on her daughter to get home from school and helping with her homework, and feeding and bathing her daughter.

Olabisi's illnesses or injuries caused her to wake up every few hours, and she got very little sleep because of her pain.

Under personal care, Olabisi stated that she: could not iron clothes; could bathe on her own, but her daughter helped her sometimes; kept her hair in a ponytail because her arms; could feed herself when she had an appetite; sometimes did not make it to the restroom to use the toilet; and sometimes forgot to take her medicine, but her friend provided daily reminders. Olabisi prepared her meals weekly, usually something "easy and quick" because she could not make a "full course meal" as it was hard for her to stand, but her older daughter tried to prepare weekly meals when she could. Olabisi could wash dishes and wipe down the counters but needed help doing yardwork and laundry because those tasks hurt her back and made her dizzy. She drove occasionally, but usually only when she had someone else with her, and shopped for her daughter's clothes when necessary. Her hobbies included watching television and coloring. She visited with her children two or three times per week and attended church regularly.

Olabisi indicated that her illnesses and conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, concentrate, follow instructions, and complete tasks. She could only walk short distances for about five minutes, could only pay attention for about thirty minutes, did not handle changes in routine well, and was scared that she may fall and hit her head. She used a cane and glasses or contact lenses.

On January 16, 2020, the administrative law judge conducted a hearing, where Olabisi testified about the following. She became unable to work on February 12, 2018 and had not worked since that date. Olabisi's symptoms included problems in her back, which made it difficult for her to sit for long periods, and problems down her legs, which made bending and stooping difficult. Pain medications helped a little with her pain but made her feel dizzy and nauseous and blurred her vision. She could stand for about fifteen to twenty minutes at a time, walk for about twenty to thirty minutes at a time, and sit for about twenty to thirty minutes at a time. Olabisi could lift about five pounds and had an operation on her hand, which did not provide her with any improvements. Olabisi got migraines twice a week, each lasting about two days, and she had problems with sound during the migraines. Medications helped her migraines sometimes, but if she was afflicted with a particularly bad migraine, she went to the emergency room to receive a shot. On a typical day, she stood, sat, and walked, did light driving, did limited household chores, did not prepare meals, needed help getting dressed, needed help bathing sometimes, could not do the laundry, and shopped occasionally. She slept for two or three hours per night and took ten-minute naps throughout the day.

In her job as a bus driver, she sometimes had to help passengers carry their bags, which weighed about fifty to sixty pounds. She also had to climb the bus steps, walk throughout the bus, strap down wheelchairs, bend, and stoop. Sometimes, Olabisi had to

help wheelchair passengers get on the bus.  Due to surgery on her right hand, she could not do any handling or grasping with it, and she wore a brace all the time.  She experienced neck and low-back pain all the time, as well as spinning, nausea, dizziness, and seizures.  Olabisi clarified that the seizures were more like blackouts where she would lose consciousness, and they did not occur regularly.  Her knees hurt constantly, and while she used a cane, her right-hand surgery made gripping the cane difficult.  She took about seventeen medications and often experienced shortness of breath when walking.

The administrative law judge called Jenny Kramer, a VE, to testify.  The VE classified Olabisi's previous work as a medium strength level position with an SVP level of 4.  The judge asked the VE if, hypothetically, an individual could perform Olabisi's past work, if the individual was the same age, had the same education and past work experience, and had limitations of light exertional level with: (1) occasional climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) occasional balancing, stooping, kneeling, crouching, and crawling; (4) occasional overhead reaching; (5) no more than frequent handling and fingering; and (6) was limited to work settings outside the presence of moving mechanical parts or at unprotected heights; (7) could only perform work that needed little or no judgment to do simple duties that could be learned in thirty days; (8) was able to deal with changes in a routine work setting; and (9) socially could relate adequately to supervisors, sometimes with coworkers, and generally with the

public. The VE testified that the individual would be unable to perform Olabisi's past work, but such an individual could perform other positions such as a photocopying machine operator, of which there were around 18,000 positions nationally, a routing clerk, of which there were around 50,000 positions nationally, or a house-keeping cleaner, of which there were around 295,000 positions nationally. Next, the judge asked the VE whether an individual could perform any work in the national economy if, in addition to the details in the first hypothetical, the individual was off task for approximately twenty percent of the workday, accounting for two fifteen-minute breaks, and one thirty-minute break. The VE testified that the individual would not be suited for any jobs because the limitations were outside of employer tolerances. The VE also stated that up to one day of absences was tolerated per month, but anything outside of that would result in no suitable jobs.

Additionally, the following medical and opinion evidence was presented. In 2016 and 2017, before Olabisi's alleged disability onset date, she visited Baptist Primary Care ("BPC") and the emergency department of Baptist Medical Center Jacksonville ("BMCJ") on several occasions for knee, chest, fingers, and hand pain; hypertension; and migraines. In January 2017, Olabisi's medical records indicated that she had left knee swelling with pain after a fall, and an MRI finding noted that she had a history of trauma to her knee. She presented to Heartland Rehabilitation Services ("Heartland") in February 2017 to address her left knee pain, which she rated at a five out of ten pain. Olabisi was discharged from physical therapy

("PT") four months later after five sessions of therapy. In May 2017, Olabisi visited BPC to address her left knee pain, which caused her significant problems with pain. In July 2017, Olabisi presented to Heartland for an initial evaluation to address her chest pain. In September 2017, she presented to CareSpot Express Healthcare for right hand pain, which she rated as seven out of ten.

On February 7, 2018, Olabisi went to BPC to address her headaches and vision changes. Dr. Robert E. Rosemund noted that, if she controlled her blood pressure better, she would experience less frequent headaches. He also stated that she could not return to work immediately because of her symptoms.

Between February 12, 2018, and July 3, 2018, Olabisi visited BPC eight times. Dr. Rosemund noted that Olabisi had forty-nine or more active health problems including, in relevant part, depression, headaches, knee pain, chest pain, obesity, and hypertension. On various visits, Olabisi reported difficulty sleeping, persistent migraines, chest pain, body pain, and dizziness. Dr. Rosemund conducted an MRI of Olabisi's cervical spine and diagnosed her with multi-level cervical degenerative disc and spine disease, most pronounced at C5 to C6. Also, Dr. Rosemund conducted an MRI of her brain, which did not reveal any acute abnormalities or mass effects but did reveal a small meningioma.

Between February 2018, and June 2018, Olabisi visited EMAS Spine & Brain Specialists ("EMAS") seven times. Dr. Anika Goel determined that Olabisi had chronic migraines without aura; dizziness; blurred vision; and vision changes. During several visits,

Dr. Goel noted that Olabisi was alert and oriented, her immediate memory and recall were intact, and her upper and lower extremities measured five out of five on strength. In May 2018, she underwent a nerve conduction study of the bilateral lower extremities and a needle EMG of the left lower extremity, which revealed no evidence of an acute or chronic left lumbosacral radiculopathy, a lower extremity plexopathy, or entrapment neuropathy or mononeuropathy in the lower extremities.

Between February 2018 and January 2020, Olabisi visited three different emergency rooms on four occasions to address reports of pain. She visited BMCJ on two occasions, once for right knee pain and once for chest pain, but tests did not reveal medical abnormalities, and she was discharged on both occasions. Olabisi also visited Shands Jacksonville where she reported a history of headaches dating back to 1988, blurred vision, facial pain, glaucoma, and dizziness. (Doc. 13-9 at 16). Finally, she visited Ascension St. Vincent's and reported pain in her wrist, but she was discharged after her x-rays were negative for osseous or dislocation. On May 7, 2018, Olabisi visited Jacksonville Hearing & Balance Institute to address her issues with dizziness. She reported that the dizziness began ten months prior, and the severity was moderate but worsening.

Between February 2018 and July 2019, Olabisi presented to Baptist Heart Specialists and other Baptist medical offices for chest pain and hypertension. On February 28, 2018, Dr. Kenneth Adams conducted an EKG on her, which revealed sinus tachycardia, a

possible left atrial enlargement, and an abnormal ECG.  In May 2018, Olabisi received an echocardiogram, which revealed sinus rhythm, normal to slightly hyperdynamic left ventricular systolic function, and otherwise normal function and appearance.  She underwent a treadmill stress test in July 2018 that revealed no significant changes from her baseline EKG, but she was only able to walk for three minutes because she complained of knee pain and dizziness.

Between March 2018, and August 2019, Olabisi visited Brooks Rehabilitation ("Brooks") for both PT and occupational therapy ("OT").  On several occasions, she complained of headaches and dizziness that limited her daily activities because walking and bending down increased her symptoms, but she reported that a shot administered to her neck and back improved her symptoms.  Olabisi also visited Brooks for numbness and pain in both hands and wrists.  Initially, she had decreased range of motion and strength, increased hand pain, decreased hand coordination, decreased motor control, impairment on her dominant side, muscle guarding, and pain.  By September 2018, Olabisi had achieved modified independence in ambulation, feeding, toileting, bathing, grooming, and household chores, and minimum assistance in dressing.  Her records indicated that she had (1) a right-hand grip strength of ten pounds, increased from zero pounds at her initial evaluation; and (2) a left-hand grip strength of sixty-five pounds, increased from six pounds.

Additionally, Olabisi visited Brooks for OT and PT to address her bilateral knee pain. She reported that her daily activities were limited by her knee pain, including that she was unable to sleep lying down, she needed a cane to ambulate and could only walk for five minutes before she needed to sit down, she used a shower chair when bathing, and she sat down when she got dressed due to her lack of balance. Her records noted improvements in range of motion and gentle strengthening. At discharge from OT, Olabisi reported that she could (1) sleep while lying down; (2) ambulated without assistance, but was limited by her bilateral knee pain; (3) could dress herself half the time and her daughter assisted her with putting on tops and tying her shoes; (4) bathe without assistance about fifty percent of the time if she used her shower chair; (5) groom herself about fifty percent of the time, including independently washing her face and putting on deodorant; (6) fold laundry; and (7) shop with the assistance of her daughter. Likewise, at discharge for PT, Olabisi reported improvements in her pain in both knees. However, she did not meet several of her long-term goals, as she failed to achieve "clinically meaningful improvement in standing to dress, performing household chores, and ambulating for community distances." Likewise, she only met fifty percent of her long-term goal of ambulating for fifteen minutes without the use of an ambulation device while grocery shopping.

Between July 2018 and January 2020, Olabisi visited Coastal Spine & Pain Center ("Coastal") thirty-one times to address her headaches, pain in her neck, shoulders, low back, knees, wrists, and

hands, and for various treatments to alleviate her symptoms. Dr. Scott Schimpff treated Olabisi on many of her visits and diagnosed her with cervical pain and radiculopathy, knee pain in both knees, muscle spasms, carpel tunnel syndrome, low back pain, and osteoarthritis of the cervical spine. Regarding her knee pain, Olabisi received steroidal injections in her knees on several occasions, and twice in her back, which she stated relieved her pain.

In September 2018, her cervical spine, left knee, and lumbar spine were radiographed with the following results: (1) her cervical spine showed mild degenerative changes between C4 and C6; (2) her right and left knees did not show any fracture or significant degenerative changes; and (3) her lumbar spine showed slight retrolisthesis of L5 over L1 in the extension view with mild levoscoliosis. In October and November 2018, Olabisi presented to Coastal for a cervical medial branch block left and right at the C3-C6 levels. In December 2018, an MRI was conducted on her right knee, which resulted in a finding of an intrasubstance myxoid change to her meniscus, without a surface tear, trace joint effusion, and trace fluid in her deep infrapatellar bursa.

Also, at Coastal, Dr. William Neway III treated her for her wrist pain and numbness, which he diagnosed as carpal tunnel syndrome and de Quervain Tenosynovitis. Olabisi's left and right wrists were x-rayed in November 2018, but neither wrist demonstrated a fracture, dislocation, or subluxation, and her alignment of bones was excellent, her soft tissue planes were normal, she did not have any foreign bodies, and her bone density and maturity were

normal. Dr. Neway performed a carpal tunnel release and de Quervain's release on Olabisi in June 2019 (right hand and wrist) and December 2019 (left hand and wrist). After the surgery on her right hand and wrist, she reported that her numbness and tingling had improved and that her home physical therapy exercises helped increase her range of motion.

Further, many of Olabisi's visits to Coastal were for medication management, and she frequently stated that pain medications "significantly" or "moderately" improved her symptoms without reporting any side effects. Also, on at least one occasion she reported that her medications provided her with a reasonable level of pain relief, with improvements in both function and activity tolerance. Olabisi's medical records from Coastal indicated that PT and OT improved her pain.

In August 2018, Olabisi presented to the Jacksonville Eye Center for an eye exam, where Dr. Robert Schnipper noted that she had primary open-angle glaucoma and had limited mobility due to a leg brace.

In November 2018, Olabisi presented to Advanced Diagnostic Group for an MRI of her cervical spine. Dr. David R. Priest reported that the MRI revealed a concentric uncovertebral hydropathy, which in conjunction with facet hypertrophy and ligamental flava laxity, precluded mild central canal narrowing, mild right neural foraminal narrowing, and moderate-severe left neural foraminal narrowing, at the C5 to C6, C4 to C5, and C3 to C4 levels.

Olabisi returned to Brooks in August 2019, where she reported that her right hand was in so much pain that she could not use it.  She reported that she had to use her left hand when eating, and dressing, and that she could not use her right hand to get dressed, use the toilet, bathe, and do laundry. Brooks discharged Olabisi in October 2019, noting improvement in her pain symptoms from her initial evaluation.  Lizbeth Martinez, OT, noted that Olabisi made significant improvements and met most of her goals, increased her strength, and decreased pain.

In October 2019, Olabisi presented to Heartland for PT. Olabisi reported that she had bilateral neck pain with pain down her spine and migraines.  She returned the next month, where her chief complaint was pain from the base of her skull down to her shoulder blades.

Dr. Puadesty from St. Vincent Healthcare completed a physician medical source statement for Olabisi.  Dr. Puadesty stated that he treated her between August 2018 and December 2019 and diagnosed her with chronic pain, migraines, seizures, and carpal tunnel syndrome.  He also stated that Olabisi was debilitated because of her chronic medical issues, which included symptoms of pain, headaches, migraines, limited mobility, limited ability to stand or sit, loss of dexterity, and photophobia.  Dr. Puadesty indicated that he expected Olabisi's symptoms to last at least twelve months, emotional factors contributed to the severity of her symptoms and functional limitations, and she suffered from depression. He stated that she could only walk zero to one city block without

rest or severe pain, she could sit for only five minutes before she needed to stand and could only stand for five minutes before she needed to sit. Dr. Puadesty noted that he was unsure whether Olabisi could tolerate working because of her pain, and that if she was employed, she would often need to take unscheduled breaks due to muscle weakness or pain. As for her limitations, Dr. Puadesty recorded that Olabisi could sometimes lift less than ten pounds but could never lift twenty or fifty pounds and that she could never twist, stoop, crouch, climb stairs, or climb ladders, and she had a significant limitation with reaching, handling, or fingering. He also stated that she would be off-task more than twenty-five percent of the time and was incapable of even low-stress because of her pain and migraines, and she would likely be absent from work more than four days per month.

On February 26, 2020, the administrative law judge issued a final decision. Using the five-step sequential evaluation process, the judge found that Olabisi: (1) met the insured status requirements through December 31, 2023; (2) had not engaged in substantial gainful activity since February 12, 2018; (3) had severe impairments of migraines, a seizure disorder, carpal tunnel syndrome, cervical and lumbar degenerative disc disease, hypertension, obesity, depression, and anxiety; and (4) had non-severe impairments of glaucoma and knee pain, which did not limit her ability to perform basic work activities. At step four, the judge found that Olabisi did not have an "impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the

listed impairments in 20 CFR Part 404." As for Olabisi's mental impairments, the ALJ found that she had a "moderate limitation in understanding, remembering or applying information; a moderate limitation in interacting with others; a mild limitation regarding concentrating, persisting or maintaining pace; and a moderate limitation as for adapting or managing oneself."

At step five, the administrative law judge considered all of Olabisi's symptoms and the extent to which those symptoms could be accepted as consistent with the objective medical evidence and found that Olabisi had the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). However, he found that Olabisi had the following limitations:

> no climbing of ladders, ropes, and scaffolds; no more than occasional climbing of ramps and stairs, balancing, stooping/bending, kneeling, crouching, and crawling; no more than occasional reaching overhead; no more than frequent handling and fingering; limited to noise level of 3 or moderate; no exposure to moving mechanical parts and unprotected heights; limited to performing simple work, which needs little or no judgment to do simple duties that can be learned on the job in a short time (up to and including 30 days); is able to deal with changes in a routine work setting; can adequately interact with supervisors; and no more than occasional interaction with the general public and co-workers.

The judge found that Olabisi's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." The judge stated that he could not give evidentiary weight to medical opinions and prior administrative findings, but he considered them in making his findings. The judge deemed the state agency medical consultants as persuasive, as they were "supported by detailed explanation, rationale, and analysis of the medical evidence of record available at time of their review." The judge also found the opinions of the state psychological consultants less persuasive because medical records received after the state psychological evaluations established that Olabisi had severe mental impairments that imposed non-exertional limitations. The judge also found Dr. Puadesty's opinion unpersuasive because it was not supported by objective medical findings and was inconsistent with the medical evidence in the record. He noted that there were no medical records on file from St. Vincent's except for emergency room records, despite Dr. Puadesty's statement that he had been treating Olabisi since 2018.

The administrative law judge found that Olabisi claimed she had limited daily activities, but that she also reported that she lived alone, cared for her daughter, cooked simple meals, cared for her personal needs, washed dishes, wiped down countertops, shopped, managed finances, went to church, and drove short distances. He

found that she received treatment that had been "somewhat successful in controlling her symptoms" and that the record was silent as to any objective medical findings that would prevent her from performing work activities within her RFC. The judge also found that Olabisi's alleged disabling impairments were present at approximately the same level of severity before the alleged onset date, which was bolstered by her appearance and demeanor at the hearing. The judge "emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the persuasiveness" of Olabisi's allegations and her RFC.

Next, the administrative law judge found that Olabisi could not perform any past relevant work as a bus driver. He found that she was a "younger individual," had a least a high school education, and was able to communicate in English. The judge found that, considering Olabisi's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform, including jobs such as a photocopy machine operator, routing clerk, and housekeeping cleaner. Ultimately, he found that she was not disabled as defined by the SSA from February 12, 2018.

Olabisi requested review by the Appeals Counsel ("AC"). The AC denied Olabisi's request, finding no reason to review.

### B. District Court Proceedings

Olabisi challenged the administrative law judge's decision in district court. In response, the Social Security Commissioner

argued in favor of the decision, stating that the administrative law judge properly considered the relevant evidence when he made his RFC finding, and his RFC finding was supported by substantial evidence.  The parties consented to have the case heard by a magistrate judge.

The magistrate judge issued an order affirming the administrative law judge's denial of Olabisi's request for benefits.  The magistrate judge found that Olabisi had raised one argument on appeal: "The unfavorable decision does not evidence a substantial consideration of the prescribed physical/occupational progress notes. Can said decision be respected as comprehensively depicting the effects of all impairments?"  The magistrate judge rejected Olabisi's argument, finding that even though the administrative law judge did not specifically mention the records Olabisi identified, the judge adequately reviewed the overall medical evidence. The magistrate judge explained that it was not the function of a reviewing court to reweigh the evidence as a whole.  This appeal ensued.

## II.    STANDARD OF REVIEW

We review a social security disability case to determine whether the Social Security Commissioner's decision is supported by substantial evidence. *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1313 (11th Cir. 2021).  We review *de novo* whether the administrative law judge applied the correct legal standards.  *Id.* at 1313–14.  In reviewing for substantial evidence, we "may not decide the facts anew, reweigh the evidence, or substitute our

judgment for" the administrative law judge. *Id.* at 1314 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011)). Substantial evidence is relevant evidence, greater than a scintilla, that "a reasonable person would accept as adequate to support a conclusion." *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021) (quoting *Winschel*, 631 F.3d at 1178); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). However, a decision is not based on substantial evidence if it focuses on one aspect of the evidence while disregarding contrary evidence. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).

## III.    ANALYSIS

Eligibility for DIB requires that the claimant be disabled. 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if she cannot engage in substantial gainful activity because of a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for at least twelve months. *Id.* § 423(d)(1)(A). "[T]he claimant bears the burden of proving that [she] is disabled, and, consequently, [she] is responsible for producing evidence in support of [her] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

To determine whether a claimant is disabled, the administrative law judge considers medical opinions from acceptable medical sources, including physicians and psychologists. 20 C.F.R. § 404.1502(a)(1)–(2). For claims filed on or after March 27, 2017, the administrative law judge cannot "defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." *Id.* § 404.1520c(a). When the administrative law judge evaluates the persuasiveness of medical opinions and prior administrative medical findings, the judge should consider (1) supportability, and (2) consistency as the most important two factors, but he should also consider (3) the medical sources relationship with the claimant; (4) whether the medical source received an advanced education and training to become a specialist; (5) and other factors. *Id.* § 404.1520c(b)–(c). As to supportability, the judge should consider objective medical evidence that is supported by medical opinions as more persuasive. *Id.* §404.1520c(c)(1). And, as to consistency, the judge should consider medical opinions that are more consistent with evidence from other medical sources and nonmedical sources as more persuasive. *Id.* § 404.1520(c)(2).

A three-part "pain standard" applies when a claimant attempts to establish disability through her testimony of pain or other subjective symptoms. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). To meet the pain standard, the claimant must provide "evidence of an underlying medical condition and either" and either provide objective medical evidence confirming the severity of the claimant's alleged pain arising from that condition or show "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *accord Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999). This

standard "also applies to complaints of subjective conditions other than pain." *Holt*, 921 F.2d at 1223. "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Id.* "Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995); *accord Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992).

The administrative law judge must consider all the claimant's symptoms, including pain, to "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a). Additionally, the administrative law judge considers all of the claimant's "statements about [her] symptoms, such as pain, and any description [her] medical sources or nonmedical sources may provide about how the symptoms affect [her] activities of daily living and [her] ability to work." §§ 404.1529(a), 416.929(a). However, the claimant's statements about her pain alone are not sufficient to establish that she is disabled, and the claimant must provide "objective medical evidence from an acceptable medical source that shows [that the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged," and that could lead to a conclusion that the claimant is disabled. §§ 404.1529(a), 416.929(a). Additionally, Social Security Ruling 16-3p requires "adjudicators to consider all of the evidence in an

individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." 81 Fed. Reg. 14166 (Mar. 16, 2016).

When evaluating a claimant's subjective symptoms, the administrative law judge must consider such things as (1) the claimant's daily activities; (2) the nature and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) effects of medications; and (5) treatment or measures taken by the claimant for relief of symptoms. *See* 20 C.F.R. § 404.1529(c)(3). If the administrative law judge "discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225 (citation omitted).

Reviewing the record, substantial evidence supports the administrative law judge's determination that, although Olabisi's medical impairments could be reasonably expected to cause her symptoms, including pain, her statements regarding the intensity, persistence, and limiting effects of her symptoms were not convincing, as they were not entirely consistent with the medical evidence and other evidence in the record. This finding is supported by substantial evidence in the record including Olabisi's function report, her testimony, and the objective medical evidence detailed above.

To the extent that Olabisi asks us to reweigh the evidence presented to the administrative law judge, we decline to do so.

Additionally, under our caselaw, in order to properly present an issue on appeal, a party "must plainly and prominently so indicate, i.e., in a section of [her] brief that is demarcated by a boldface heading or by some equivalent notation." *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). And, "[a]t the very least, [s]he must devote a discrete, substantial portion of his argumentation to that issue"; otherwise, the issue will be considered abandoned. *Id.* Notably, a party fails to adequately present an issue by raising it only in a passing reference or perfunctory manner, particularly where it is "buried" within other arguments or through conclusory assertions "without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681-82 (11th Cir. 2014).

Here, Olabisi raised the administrative law judge's treatment of the medical opinion of Dr. Puadesty, description of her appearance and demeanor while testifying, and reliance on the VE's hypothetical in a perfunctory manner, failing to devote discrete, substantial portions of her brief to these issues. *See id.* Because Olabisi has not adequately briefed those issues, we therefore conclude that she abandoned them. *Id.*

Accordingly, we affirm.

**AFFIRMED.**